**L. J. ROBINSON, INC., a corporation, Appellant,**

v.

**ARBER CONSTRUCTION COMPANY, Inc., a corporation, Appellee.**

**No. 5896.**

District of Columbia Court of Appeals.

Argued Jan. 25, 1972.

Decided July 11, 1972.

Polly W. Craighill, with whom Edgar T. Bellinger, Washington, D. C., was on the brief, for appellant.

John F. Burke, Bethesda, Md., for appellee.

Before HOOD, Chief Judge, and FICKLING and YEAGLEY, Associate Judges.

---

YEAGLEY, Associate Judge:

This appeal followed the trial court's denial of a motion for reconsideration or in the alternative for a new trial by L. J. Robinson, Inc., (Robinson) appellant herein and defendant-counterclaimant below.

The case was tried without a jury and submitted on appeal on an "Agreed Statement of Proceedings and Evidence." The trial judge initially entered judgment for Robinson [1] on Arber Construction Company's (Arber's) claim for monies due and owing for fill material, use of equipment and services furnished pursuant to an oral contract, and judgment for Arber on Robinson's counterclaim for damages stemming from Arber's alleged breach of said contract.

Arber then filed a motion for reconsideration and three months later the court issued a "Supplemental Opinion" in which it ordered Robinson to pay Arber $1,816 for materials furnished in February which met contract specifications. Although acknowledging in its "Supplemental Opinion" that Arber had breached the contract by supplying fill in April that did not meet the specifications, the court again denied Robinson relief on its counterclaim.[2] The case comes to us on the following facts.

In December of 1967, Robinson entered into a contract with the Department of the Interior, National Park Service for the construction of a swimming pool and bathhouse in northeast Washington. Certain excavations as well as the furnishing of fill dirt were required as part of the contract. However, the dirt supplied by Robinson in January of 1968 was rejected by the Government's inspector as not meeting contract specifications.

Sometime in early February 1968, Robinson entered into an oral contract with Arber whereby the latter was to remove the unsuitable fill material and deliver other fill (quantity not stated) meeting the specifications to the construction site at a fixed price per cubic yard. Arber commenced performance of the contract by delivering conforming fill material to the construction site in February of 1968. On February 23, Arber submitted a bill in the amount of $2,508.75 for the removal of the unsuitable fill and on February 29 a bill in the amount of $4,259 for the delivery of the conforming fill material. Robinson made payment of $3,135 and $1,816.37, leaving an unpaid balance of $1,816.38.

On April 3, Arber resumed delivery of fill material. Although Robinson's supervisory employee was present at the construction site and accepted these deliveries,[3] the Government subsequently on April 8 formally rejected all fill delivered between April 3–5 inclusive on the ground that it did not meet contract specifications. Arber was then directed by Robinson to remove the unsuitable fill material and replace it with material meeting contract specifications. Arber refused, whereupon Robinson made no further payments for deliveries and proceeded to remove the unaccepted fill and secure the balance of the fill material required by the contract elsewhere. This lawsuit followed.

1. In its "Opinion", the trial court said: "Under the entire circumstances of the case, the Court concludes that the plaintiff has failed to prove its case by a preponderance of the evidence, and therefore directs judgment for the defendant."

2. In its "Supplemental Opinion" the court stated that its reason for denying Robinson relief on its counterclaim was that it had a supervisory employee present at the construction site when Arber unloaded the nonconforming April deliveries. The court concluded that the "employee, with reasonable diligence, could have rejected the deliveries if they were failing in specifications, and thereby have prevented the off-loading and spreading of the fill material that is now the basis for damages sued for in [Robinson's] Counterclaim."

3. This was evidenced in the record by several receipts (plaintiff's exhibits Nos. 7 and 8) signed by Robinson's supervisory employee, R. C. Smallwood, acknowledging Arber's April deliveries of fill material. *Also see* note 5.

Robinson seeks reversal here on two grounds. First, that the trial court's judgment against it on its counterclaim is not supported by the evidence. Secondly, Robinson argues that since the trial court found that Arber breached its contract with Robinson through the delivery of unsuitable fill, it is entitled to damages as a matter of law.

At the outset we note that the trial court apparently entered two conflicting or inconsistent judgments, the first finding that Arber "has failed to prove its case" and the second awarding Arber $1,816 as the unpaid balance on the February deliveries. Although the second judgment is inconsistent with the first in that regard, the "Agreed Statement of Proceedings and Evidence" clearly recites that there was $1,816 due and owing to Arber for deliveries made in February which met the contract specifications. Since Robinson thereby conceded liability to that extent, it implicitly accepted the correctness of the trial court's order entered on January 6, 1971. Therefore, we do not reach the question that might be posed by the presence of what appears to be two inconsistent judgments.[4]

■ Turning to Robinson's first contention, we think the trial court's finding against it on the counterclaim is supported by the evidence.

Robinson well knew it would have to remove any fill that did not meet the specifications of the Interior Department as it had been compelled to do just that with earlier deliveries in February. It is unreasonable to conclude that Robinson would again permit substantial quantities of fill to be spread over various areas in the construction site and rolled unless the fill had been deemed acceptable.[5] Although the fill delivered by Arber in the early part of April did not measure up to specifications, we agree with the trial court that Robinson's supervisory employee, who was present when the deliveries were made, could have rejected the unsuitable fill and "thereby have prevented the off-loading and spreading of the fill material".

Further, the evidence would indicate that the fill material was accepted on delivery and immediately put to use. It was not piled to one side to await inspection but placed in the various areas where needed and apparently leveled off and rolled.[6] For example, in defendant's (Robinson's) exhibit No. 3, the Department of Interior said in rejecting the material on April 8, 1968:

> Mr. Smallwood was informed at the job site that the fill material being placed adjacent to the large swimming pool and wading pool and in areas to receive paving is rejected as not meeting specification requirements. In addition it was pointed out that the areas immediately adjacent to the large swimming pool were not being backfilled and compacted as required by the specifications.
>
> All fill being placed under paved areas that does not meet the requirements of Division 2, paragraph 3D.B. and Section 2.02, paragraph 8 is rejected and you are hereby directed to replace this fill material with fill material that does comply with the specifications.

Defendant's exhibit No. 1, a letter of April 25 from the Department of Interior to Robinson, also indicates that the fill had been put in place in various designated areas on the project.

---

4. McKillen v. Morrison, D.C.Mun.App., 87 A.2d 535 (1952).

5. Robinson's supervisory employee, Mr. Smallwood, signed receipts acknowledging the delivery of material in February and April. However, it is of some significance to note that the receipts for the February deliveries had disclaimers as to the quality of the material stamped above Mr. Smallwood's signature, whereas the April receipts contained no such disclaimers. Plaintiff's (Arber's) exhibits Nos. 4–8.

6. Plaintiff's (Arber's) exhibits Nos. 1, 7 and 8 reflect that Arber was charging Robinson for the use of an H.D. 11 roller from April 3–5.

We note further that the agreement was not that the fill must be approved by the Department of Interior but rather that it meet Interior's specifications. If the subcontractor, Arber, is to be held to have knowledge of the specifications for fill and to make deliveries accordingly, then it is only reasonable to hold that the contractor, Robinson, also should be expected to be familiar with the specifications and able to determine on delivery or soon thereafter whether a given load meets the specifications and is acceptable.

In this connection, the Uniform Commercial Code provides:

(1) Acceptance of goods occurs when the buyer . . . .

(b) fails to make an effective rejection (subsection (1) of section 28:2–602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the sellers' ownership . . . . [D.C. Code 1967, § 28:2–606.]

In its first "Opinion" the trial court indicated it had no way of knowing why the April deliveries "were rejected as lacking in required specifications", nor do we. In this regard, the Uniform Commercial Code provides that:

(1) The buyer's failure to state in connection with rejection a particular defect which is ascertainable by reasonable inspection precludes him from relying on the unstated defect to justify rejection or to establish breach

(a) where the seller could have cured it if stated seasonably . . . . [D. C.Code 1967, § 28:2–605.]

Yet, Robinson permitted Arber to deliver 141 loads of fill from April 3–5 without objection being made until April 8. And, as indicated previously, Arber was never advised in what particulars the fill failed to meet specifications. In this regard the Code states: "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." D. C.Code 1967, § 28:2–602.

Consequently, Robinson, having accepted the goods on delivery, or shortly thereafter, and further, in later attempting to make a rejection of the goods, having failed as required by the Uniform Commercial Code to advise Arber timely in what fashion they did not meet specifications, it has not established a rejection of the goods under the Code. Accordingly, the trial court did not err in finding against Robinson on its counterclaim for damages for the cost of removing the fill.

■ In light of the foregoing, we must also disagree with Robinson's contention that the trial court, having found that Arber breached the contract when it supplied substandard fill in April, was required to award damages to Robinson as a matter of law. The preceding Code provisions are controlling and we know of no authority supporting Robinson's argument.

■ As to Arber's failure to supply all the fill required for Robinson to complete its contract, there is nothing in this record establishing that Arber had agreed to furnish a certain quantity of fill. From this limited record we cannot determine whether the February delivery equaled in amount the quantity of fill removed from the site earlier or whether the February and April deliveries together were more or less than that amount. The only agreement established by the record before us is one to furnish fill of certain quality at $1.50 per cubic yard. Arber cannot be held liable in damages for having discontinued deliveries when a dispute arose over payment for deliveries already made and not properly rejected. We hold that the trial court correctly denied Robinson damages on its counterclaim.

Affirmed.